**STATE of Missouri, Respondent,**

v.

**Edward JOHNSON, Appellant.**

**No. 56502.**

Supreme Court of Missouri,
Division No. 1.

Jan. 8, 1973.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Sp. Asst. Atty. Gen., St. Louis, for respondent.

Karl F. Lang, St. Louis, for appellant.

SEILER, Judge.

This is an appeal from a first degree murder conviction with a life sentence. We have jurisdiction because the appeal was pending here January 1, 1972 and prior to the decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346.

Three persons were fatally stabbed in a robbery in an apartment in St. Louis the night of October 31–November 1, 1969. Two of them, Mrs. Hermine Rohs, and Willy Rohs, her adult son, were dead on arrival of the police. The third, Rohs' wife, Mrs. Marilyn Rohs, died November 10 from her wounds. Defendant was tried for the murder of Marilyn Rohs.

The St. Louis police, on November 3, 1969, around 6:00 p. m., arrested defendant as a suspect. The police had no warrant. It does not appear from the record what reasonable grounds, if any, the police had for suspecting defendant. The police were in defendant's house with him for 30 minutes or so immediately following the arrest. There is a dispute as to whether they had his permission to enter and to

what extent they conducted a search of his house and his truck parked in front of the house. Defendant was then taken to the police station and interrogated about the Rohs case. Around 9:00 p. m. he was taken to the victim's room at Barnes Hospital for a one-man showup. Shortly after leaving the victim's room, defendant made the first of several incriminating statements about participating in the robbery. He also told the officers they could find the man he said did the actual killing by a clue to the man's identity in the wallet which defendant had left at home. The police, by means of the clue in the wallet (a driver's license) promptly located and arrested the man, Willie James, and found in James' possession a ring and watch which were identified as belonging to the deceased Willy Rohs.

Defendant does not argue there is not sufficient evidence to support the conviction, if the evidence is admissible, although he denies any guilt and asserted an alibi. His position is that the oral incriminating statements and the ring and watch used against him on which the conviction rests were the fruit of his illegal arrest and an illegal showup conducted in the victim's hospital room, and hence the court erred in overruling his motions to suppress and in admitting the evidence.

We first examine the motions to suppress, the evidence at the suppression hearing, and the findings and conclusions of the trial court. The motion to suppress evidence was directed at evidence seized by the police from defendant's house and automobile (this part becomes academic as the state made no effort to offer any such evidence and it does not appear the clothing and shoes which they took from the house in any way led to defendant making the incriminating statements in question) and the ring and watch seized at Willie

James' house. The motion to suppress statements was directed at all the oral statements made to the police by defendant. Defendant's grounds were violation of his privilege against self-incrimination and right to counsel and that the evidence and oral statements were all fruit of the original unlawful arrest.

Defendant's testimony was that he was arrested by six or seven policemen as he was approaching the front door of his house after work. He was taken inside and seated in the living room while the officers went through the house and searched his truck. Then he was taken to the police station. He denied telling the police that the name of the person who committed the crime with him was in a wallet at his house, or that he had left a wallet there; denied that he gave the officers permission to search the house at the time of his arrest or to return to the house and get the wallet. Defendant produced one Edward C. Vancil, a former attorney in the public defender's office in St. Louis. Vancil testified that James Roche, an assistant circuit attorney, had called him to come to Barnes Hospital, that the police had a suspect named Edward Johnson and wanted to show him to a witness there. When Vancil reached the hospital he learned the suspect had already been shown to the victim. Vancil then went to the police station, arriving there around 9:45 p. m. and remaining there for the next three or four hours.

Without reciting the details, there was evidence from the state that defendant was advised as to his constitutional rights immediately following his arrest;[1] that he said he understood; that he was again so advised upon arrival at the police station; that defendant made no request for counsel, saying he had done nothing and did not need a lawyer, and did not ask permis-

---

1. We do not take the space to set forth the exact warnings given, as defendant makes no claim that what the police testified they said to him was not sufficient to satisfy Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, and Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381, if it was said.

sion to use the telephone; that at the hospital, when, following the showup, he admitted he was present when the murders occurred, he was again advised as to his rights, this time by the circuit attorney; that when he said upon return to the police station that there was a clue to the identity of the person who did the actual killing in his wallet at home, he was informed he would have to give permission for the police to enter the house and that what they found in the wallet would be used against him and the other person; that defendant said it was all right for them to get the wallet; that there were no threats or promises made and no violence at any time.

The trial court found there was no probable cause for the arrest, but that the incriminating statements were voluntary and that the testimony was sufficient to establish the warnings had been given, especially when there was no testimony from defendant that the warnings had not been given or that any pressure was applied to him; that as to the police entering the house and obtaining the wallet, the evidence showed defendant had consented. The court overruled the motions to suppress.

During the ensuing trial on the merits, much of the evidence presented in the pre-trial suppression hearing was repeated before the jury and defendant's counsel kept alive his objections to the evidence in question, and again it was a matter of factual dispute between the police and defendant. The testimony of the police officers was about the same as on the motion to suppress. In addition, the state called the first assistant circuit attorney, James Roche. Mr. Roche testified he advised defendant at the police station as to his constitutional rights, told him they wanted Mrs. Rohs at the hospital to look at him and he had gotten in touch with the public

defender and was sending a police car for him. Mr. Roche testified further ". . . he (defendant) said, what's this about, and I said, we have a girl out there we want to look at your [sic], and he said, if all she's going to do is look at me, then, let's get it over with, I don't need a lawyer, and he walked out."

Defendant testified in his own behalf. He again denied giving the officers permission to search and denied being involved in the crime or making any of the incriminating statements attributed to him. He offered an alibi, uncorroborated. He also denied being warned as to his rights by anyone and said he repeatedly asked for a lawyer but got no response. In rebuttal the state put on the circuit attorney, Brendan Ryan,[2] who testified that defendant told him at the police station what happened in the Rohs apartment; that defendant said they went there to rob Mrs. Rohs, but the other man did the killings.

It should be noted that we do not know what was said or otherwise took place in the victim's room at Barnes Hospital when presumably defendant was viewed by Mrs. Rohs, or even whether she was conscious or rational at the time. There was no testimony or offer of testimony on the subject. On the record before us, the only direct identification of defendant as one of the participants in the crime came from defendant's own statements.

On the issue of whether defendant's arrest was illegal, defendant testified at the suppression hearing that he was arrested when he came home from work and that he denied to the officers that he was involved in the Rohs murders. This was confirmed by Lt. Boyd, who said defendant told them he did not do anything. Lt. Boyd said the police had no arrest order for Johnson, but were looking for him, that his name had come up as a possible suspect through an investigation at the murder

2. Neither Mr. Roche nor Mr. Ryan took part in the trial as counsel. Their court appearances were limited to appearing as witnesses and properly so, State v. Hayes (Mo.Sup.), 473 S.W.2d 688.

scene, that the night before the arrest he got information that Johnson might be a suspect. This was all the evidence on the point. At the close of the suppression hearing the trial court found there was no evidence of probable cause introduced for the arrest of the defendant and that hence the case law on searches incident to arrest did not apply. The state does not cite any authority or develop any facts to the contrary.

■ At the trial on the merits nothing was brought out which would furnish the police any reasonable basis for suspecting defendant, who was regularly employed and had no previous convictions. The police searched the apartment for fingerprints, but found none except those of Willy Rohs. Nor was there any indication that the police had any clue from Mrs. Marilyn Rohs in the interval between the crime and defendant's arrest. As far as the record before us goes, the only place the name of the defendant appeared was that behind a sofa in the apartment the police found a bag in which Mrs. Hermine Rohs kept various papers. The bag contained a miscellany of her bills, receipts, check stubs, cancelled checks, blank checks, insurance premium notices, church notices, S & H green stamps, sales slips for store purchases, and scraps of paper. Among Mrs. Rohs' receipts were several from Reliable Plumbing and Sewer Company, where defendant worked, and two or three receipts signed by defendant for repair and plumbing work he had done for Mrs. Rohs. On one of these receipts his telephone number was written. None showed any work on the date of the murders. It would be logical for Mrs. Rohs to retain her receipts and also the telephone number of her repairman. These furnished no basis for reasonable grounds to arrest the repairman for the murders.

While no one so testified directly, it seems apparent the true purpose of the arrest of the defendant was to interrogate him and then bring him in front of the victim at her hospital bed to see if she could identify him. The other two victims were already dead and Mrs. Marilyn Rohs was gravely wounded and died a week later. The analogy to Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199, at once comes to mind, where the court upheld a hospital bed confrontation and identification. But an important difference between the Stovall case and our case is that in Stovall the police had probable cause for the initial arrest of the defendant. Therefore, if the present conviction rested on a hospital identification by the victim, there would be serious question as to whether there had been an exploitation by the police of the illegal arrest which could not be upheld. Here, however, the conviction rests on a series of incriminating statements, the first of which was made after the defendant had been taken to the victim's room and was on his way to the hospital elevator or was in the elevator going down. After he once started making admissions he kept on, each more damning than the prior, until finally he disclosed information by which the police located and arrested the other man involved, finding in his possession a ring and watch taken from one of the victims.

■ Illegal arrests cannot be used to turn up evidence on which to obtain a conviction, see Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676, where the court reversed a conviction resting on fingerprint evidence where the police obtained the fingerprints of defendant for comparison by arresting him without probable cause. As the court observed, 394 U. S. 726, 89 S.Ct. 1397: " . . . But to argue that the Fourth Amendment does not apply to the investigatory stage is fundamentally to misconceive the purposes of the Fourth Amendment. Investigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention . . . " The point is that the police must observe the law the same as anyone else. To make an exception for the police for illegally seized evidence would encourage

overreaching police conduct. Unless such evidence is excluded the police will have the strongest incentive to violate the Fourth Amendment in cases where otherwise they can be expected to respect it.

Defendant takes the position that because of the illegal arrest and lack of counsel at the hospital confrontation, it follows automatically that the incriminating statements and the ring and the watch found at Willie James' house are inadmissible as being "fruit of the poisonous tree", citing Wong Sun v. United States, 371 U. S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441, as his leading case. This court has refused to adopt defendant's position, reasoning the fact may be in some cases that, despite the illegal arrest, the statements actually are made voluntarily without coercion. See State v. Fair (Mo.Sup. banc), 467 S.W.2d 938 and State v. Newell (Mo.Sup.), 462 S. W.2d 794.

■ Under the record before us, we cannot say the trial court erred in holding that the statements were voluntary. If defendant were given the warnings which the police and their witnesses testified to and if he made the responses and statements attributed to him, without coercion or overreaching, all of which the trial court found as being the fact, and there being evidence in the record to support these findings, then it can be said fairly that the incriminating statements and what was developed against defendant from them were not the product or exploitation of the illegal arrest but were rather from defendant's own decision to speak out, and the trial court did not err in admitting the incriminating statements and the ring and watch found in the possession of defendant's companion.

Judgment affirmed.

HOLMAN, P. J., and RICKHOFF, Special Judge, concur.

BARDGETT, J., not sitting.